UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MARGARET ANN GLASS | * | CIVIL ACTION NO. 17-2277 |
| | * | |
| VERSUS | * | SECTION: "F"(1) |
| | * | |
| NANCY A. BERRYHILL, ACTING | * | JUDGE MARTIN L. C. FELDMAN |
| COMMISSIONER OF THE SOCIAL | * | |
| SECURITY ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************* | * | |

REPORT AND RECOMMENDATION

The plaintiff, Margaret Ann Glass, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. § 1381. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 14) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 15) be GRANTED.

## Procedural Background

Ms. Glass applied for SSI and DIB on August 19, 2014, asserting a disability onset date of May 9, 2014. She alleged the following illnesses, injuries, or conditions:  arthritis, lower back, neck, right leg; hypertension; weakness and pain in hands; and headaches. On December 3, 2014, her claim was denied by the state agency. The Disability Determination Explanations concluded that her hypertension was not severe and did not result in significant limitations in her ability to perform basic work activities. R. at 80, 83.

Ms. Glass obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on March 18, 2016. During the hearing, Ms. Glass amended her disability onset date to December 2, 2014. On April 20, 2016, the ALJ issued an adverse decision. The Appeals Council denied review on February 13, 2017.

On March 17, 2017, Ms. Glass filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 11, 12). The parties filed cross-motions for summary judgment. (Rec. Docs. 13, 14). Ms. Glass is represented by counsel.

## **Evidence in the Record**

### *Testimony*

Ms. Glass was represented by counsel during the hearing before the ALJ on March 18, 2016. R. at 35. Counsel explained the legal theory as follows: the combination of Ms. Glass's impairments would prevent her from engaging in any substantial gainful activity, and that even if she was able to perform sedentary work, given her age, past relevant work, and lack of transferrable skills, grid rule 201.02 directs a finding of disability. R. at 39.

Ms. Glass explained that she is unable to work due to constant pain. R. at 41. She said that she can only walk a block before her feet start swelling and she has to lay down. R. at 41. She said that she can only lift items weighing up to 5 or 10 pounds. R. at 41. She also said that her wrists were weak and if she picked something up, it might fall out of her hands. R. at 49. She complained of gout in her feet and rheumatoid arthritis in her hands. R. at 41-42. She explained that she cannot wear shoes due to the discomfort, and she was wearing slip on clogs to the hearing. R. at 42. She was not using crutches at the hearing, though she had been prescribed crutches in the past. R. at

42-43. Ms. Glass also complained of headaches caused by high blood pressure once or twice a month. R. at 49. She said that she suffers from acid reflux. R. at 50.

Ms. Glass testified that she does no household chores, does not go out to eat, and occasionally goes shopping for groceries. R. at 43. She testified that she is able to do laundry. R. at 44. Ms. Glass drives about once or twice a month. R. at 44. Ms. Glass can bathe, dress, and feed herself. R. at 44. She testified that she does nothing most of the day. R. at 45. She watches some TV, walks to the door, and tries to do things in the house. R. at 45. Ms. Glass testified that she tries to keep her feet elevated and does so for about an hour at a time to reduce the swelling and burning. R. at 44, 47.

In her Function Report, Ms. Glass reported her daily activities as bathing, taking medicine, microwaving food, and light dusting. R. at 195. She also reported putting dishes in the dish washer and making the bed. R. at 196. She reported shopping for food once a week. R. at 197. She also goes to church once a week. R. at 198.

### *Vocational Expert*

Vocational expert Patricia Ehlinger testified regarding Ms. Glass's past work, which was classified as: personal care attendant, medium, semi-skilled, SVP 3; school bus driver, medium, semi-skilled, SVP 4; and medical clerk/medical records clerk, light, semi-skilled, SVP 4. R. at 52. The ALJ posed the following hypothetical: a person of similar age, education, and past work experience as Ms. Glass with a residual functional capacity of light activity. R. at 52.  The vocational expert testified that such an individual could perform work as a medical clerk and medical records clerk. R. at 53. The ALJ posed an additional hypothetical person of similar age, education, past work, and a residual functional capacity of medium activity, with a limitation to

walking no more than two blocks on a sustained basis. R. at 53. The vocational expert testified that such a person could perform work as a medical clerk and medical records clerk, as well as a school bus driver and a personal care attendant. R. at 53.

Ms. Glass's attorney posed the following hypothetical: a person with Ms. Glass's age, education, and past work, and a residual functional capacity for sedentary work because of chronic foot pain. R. at 53. The vocational expert testified that such a person would not have any transferable skills to sedentary work. R. at 53.

*Records*

A September 2012 encounter summary from St. Thomas Community Health Center indicates that Ms. Glass has had hypertension since at least 2007. R. at 257. The same encounter summary notes "pain in limb" was first identified on September 4, 2007. R. at 257. The record does not identify which limb. On October 19, 2009, she presented to obtain a tuberculosis test to receive a job. R. at 297. The notes indicate uncontrolled hypertension. R. at 297. A refill of pravastatin 20 mg was ordered on April 30, 2013. R. at 250. On July 16, 2013, she was seen by Khalil Imsais for hypertension management and complaining of two weeks of nasal congestion, sinus pressure, headache, and watery itchy eyes. R. at 245. A review of systems was performed and full range of motion in all extremities was noted. R. at 246. No erythema, warmth, swelling or joint deformities were noted. R. at 46. It was noted that hypertension was well controlled. R. at 246.

Ms. Glass visited the Emergency Department at Interim LSU Public Hospital ("LSU Emergency Department") on July 26, 2014, complaining of sinusitis. R. at 324. She was diagnosed with postnasal drip and unspecified essential hypertension. R. at 324. A physical examination was

4

performed and she was found to have 5/5 power in all extremities and her gait was steady. R.at 326.

She returned to the LSU Emergency Department on August 15, 2014, requesting a refill of amlodipine and metoprolol for her hypertension. R. at 330. A physical examination was performed and it was determined she had full range of motion in all extremities and no edema. R. at 332.

On August 22, 2014, Ms. Glass visited nurse practitioner Joyce Raby Williams at an Interim LSU Public Hospital Clinic ("LSU Clinic") to establish primary care. R. at 333. Ms. Glass denied acute pain or discomfort. R. at 333. A history of hypertension was noted. R. at 333. She was prescribed omeprazole, metoprolol, loratadine, hydrochlorothiazide, and amlodipine.  R. at 334.

She returned to the LSU Clinic for a blood pressure check on August 28, 2014. R. at 336. Her blood pressure was 136/89. R. at 336. She had taken her medication that morning. R .at 336.

On August 21, 2014, Ms. Glass returned to the LSU Emergency Department. R. at 337. She reported chronic back and hip pain for years, but no numbness or weakness. R. at 337. She reported that she had been diagnosed with arthritis and complained that she had been experiencing pain in her legs for five months that was getting increasingly worse. R. at 338. She rated her pain at 10 on a 10 point scale. R. at 338. Upon physical examination, no edema was found. R. at 339.

She returned to the LSU Emergency Department on October 21, 2014. R. at 463. She complained of chronic hip pain for years. R.at 463. She also reported bilateral knee and bilateral ankle pain. R. at 464. Upon physical examination, her gait was within normal limits, she had normal range of motion in all extremities, and no edema was observed. R. at 465.

An interview was conducted by the state agency on October 28, 2014, and it was noted that Ms. Glass had some difficulty standing up after her interview and walked slowly. R.at 60.

5

On October 30, 2014, Ms. Glass returned to the LSU Emergency Department. R. at 347. She complained of chronic pain to multiple joints especially her hands, arms, and legs, for several months. R. at 347. It was noted that she had been evaluated for the same issues nine days earlier and diagnosed with arthritis. R. at 347. In a review of systems Ms. Glass was noted to be positive for anthralgias, but negative for joint swelling and gait problem. R. at 348. Upon physical examination, it was noted she had full range of motion at all joints in upper and lower extremities with no swelling, effusion, warmth, or redness. R. at 349. Her gait was normal. R. at 349.

Dr. Sheldon Hersh performed a consultative examination on November 25, 2014. R. at 342. Dr. Hersh reviewed Ms. Glass's University Hospital records. R. at 343. Ms. Glass reported back pain since 1999. R. at 342. She said she can sit only one half hour, stand one hour, walk one block, and carry 10 pounds. R. at 342. She also reported joint pain in her knees, hands, and neck since 1999. R. at 342. She reported a history of hypertension that also began in 1999. R. at 342. Ms. Glass reported performing daily activities like cooking, cleaning, shopping, occasionally watching television, occasionally reading, and going out of the house occasionally. R. at 343.

Ms. Glass had blood pressure of 172/110. R. at 343. A physical examination was performed, and Ms. Glass was found to have normal grip and pinch strength in her upper extremities and full range of motion in the small joints of the hands, wrists, elbows, and shoulders. R. at 344. No joints were hot, tender, or swollen. R. at 344. Dr. Hersh reported that Ms. Glass was able to sit comfortably during the examination without discomfort in her back. R. at 344. No edema was noted in the lower extremities. R. at 344. Ms. Glass had full range of motion of the ankles, knees, and hips bilaterally. R.at 344. There was no joint discomfort and no joint was hot, tender, or swollen. R. at 344. Ms. Glass's gait was normal. R. at 344. Ms. Glass was able to walk on her heels and toes and was able to arise from a seated position without using her hands. R. at 344. Dr.

Hersh found that Ms. Glass has significant elevation of blood pressure, but no evidence of end organ damage. R. at 344. He made no findings of back pain. R. at 344. As to joint pain, Dr. Hersh noted that Ms. Glass has full range of motion of the joints and normal grip and pinch strength. R. at 344. He determined that Ms. Glass can do all activities of daily living and the problem is stable. R. at 344. Dr. Hersh concluded that Ms. Glass was able to sit, stand, walk, lift, carry, handle objects, hear, see, speak, and travel. R. at 344. He noted that Ms. Glass should avoid strenuous exertion until her blood pressure is better controlled. R. at 344.

Ms. Glass visited the University Medical Center Emergency Department ("UMC Emergency Department") on December 2, 2014, complaining of intermittent sharp pain in her right elbow for the past three to four days. R. at 351. No swelling was noted. R. at 351. She was ambulatory with a steady gait. R. at 351. Ms. Glass requested a note for jury duty saying she cannot sit for long periods of time. R. at 352. Her blood pressure was 148/97. R. at 353. Upon physical examination, no edema was noted. R. at 353. The right elbow was tender over the olecranon and there was pain with tricep activation, but full range of motion, no joint swelling, and no overlying erythema was noted. R. at 353. An x-ray was performed, which "only showed evidence of degenerative changes and bone spur, which may be cause of patient's pain." R. at 354.

Ms. Glass returned to the UMC Emergency Department on December 23, 2014, complaining of pain and swelling in her hands for 2-3 days and neck pain for 2-3 months. R. at 358. Her blood pressure was 137/99. R. at 359. Upon physical examination, Ms. Glass was found to have full range of motion in bilateral upper extremities and no edema. R. at 359. She had a steady gait. R. at 359. She was assessed with arthritis and prescribed Flexeril. R. at 359.

Ms. Glass visited the medical clinic and University Medical Center (the "UMC Clinic") on January 14, 2015, complaining of headaches about twice a week. R. at 419. She reported the

headaches as throbbing pain with severity of 10 out of 10. R. at 419. She reported that laying down and taking Aleve makes the headaches better. R. at 419.  She also complained of pain in her hands, right knee, neck, and back. R. at 419. Her blood pressure was 163/98. R. at 420. Upon physical examination, extremities were normal with no edema. R. at 420. The progress notes indicate that GERD and seasonal allergies were controlled with medications. R. at 422. Headaches were most likely tension headaches. R. at 422. With regard to Ms. Glass's hypertension, resident physician Dr. Erik Helander discussed using a home blood pressure cuff to document blood pressure, implementing the DASH  (dietary approaches to stop hypertension), and the importance of exercise and weight loss. R. at 422. For arthritis, Dr. Helander discussed weight loss for alleviation of back and knee pain, and Ms. Glass was instructed to ice joints and use Aleve if needed. R. at 422.

Ms. Glass returned to the UMC Emergency Department on February 23, 2015, with pain in the right ankle and bilateral lower extremity swelling that had been progressing over the past two days. R. at 360. Upon a review of systems, she reported no neck pain or stiffness. R. at 361. Upon physical examination, she was found to have normal range of motion and no tenderness. R. at 365. She exhibited 2+ pitting edema in the bilateral lower extremity to the knees. R. at 362. There was no evidence of renal, cardiac, or hypatic dysfunction. R. at 363. Her blood pressure was 139/94. R. at 362.

Ms. Glass returned to the UMC Emergency Department on March 10, 2015, complaining of bruising to the abdomen and upper thigh that she had first noticed about two weeks ago. R. at 369. She also reported joint pain. R. at 371. Upon review of systems, Ms. Glass reported arthralgias, but no back pain, gait problem, or neck pain. R. at 372. Upon physical examination,

she exhibited normal range of motion and no edema. R. at 372. Her blood pressure was 136/104. R. at 372.

Ms. Glass returned to the UMC Emergency Department on March 18, 2015, complaining of a sinus infection. R. at 375. Her blood pressure was 139/104. R. at 376. Upon physical examination, she exhibited normal range of motion. R. at 377.

Ms. Glass visited the UMC Clinic on April 22, 2015. R. at 424. A past history of hypertension, acid reflux, and arthritis were noted. R. at 425. Upon physical examination, no peripheral edema was noted. R. at 426. GERD and seasonal allergies were again noted to be controlled with medication. R. at 428. Headaches were noted most likely tension headaches and Ms. Glass was instructed to continue Tylenol/NSDAIDs. R. at 428. For hypertension, a "four dollar" list of generics was discussed as well as diet and exercise. R. at 428. And for arthritis, no deformities, swelling, warmth, or erythema was noted. R. at 428. Ms. Glass was advised to use Tylenol for pain. R. at 428. They discussed restarting Mobic once blood pressure is under control. R. at 428. X-rays of the hands were performed, with no abnormalities observed. R. at 430-31.

Ms. Glass returned to the UMC Emergency Department on June 16, 2015, complaining of right elbow pain over six months. R. at 379. She reported the pain was getting worse since her December 2014 emergency department visit regarding her elbow. R. at 379. Upon physical examination, she exhibited normal range of motion. R. at 381. Her blood pressure was 180/100. R. at 381.

Ms. Glass returned to the UMC Emergency Department on June 30, 2015, complaining of bilateral hip and leg pain for three days. R. at 383. A history of arthritis was noted. R. at 383. She described the pain as sharp pain localized in her hips that radiates to hamstrings and is worse at night. R. at 384. She also complained of right foot pain. R. at 384. However, she reported no back

pain, joint swelling, gait problem, or neck pain. R. at 385. She complained her pain was made worse by lying still and attempting to sleep and made somewhat better by ambulating and keeping busy. R. at 387. Her blood pressure was 176/119. R. at 386. Upon physical examination, no edema or tenderness was observed. R. at 386. She had intact range of motion in hip joints bilaterally, but she had pain with external rotation that radiates to right hamstring muscles. R. at 386. The assessment notes her right foot had lateral tenderness to palpation. R. at 386. Her gait was normal. R. at 387. Dr. Michael Barton determined Ms. Glass was most likely suffering from exacerbation of her osteoarthritis. R. at 387. He ordered an x-ray of her right foot to rule out occult injury. R. at 387. There was no evidence of fracture or dislocation. R. at 394. Hallux valgus deformity, minimal hypertrophic spurring of the distal head of the 1st metatarsal, and planta calcaneal spur was noted. R. at 394.

Ms. Glass returned to the UMC Emergency Department on July 21, 2015, complaining of right foot pain and swelling for three days. R. at 395. Her right foot was very sensitive with limited range of motion, and Ms. Glass was screaming and crying during the assessment. R. at 395. She was exhibiting edema at the right foot. R .at 399. She was negative for back pain, gait problems, and headaches. R. at 398. Two hours later, Ms. Glass reported the pain had let up a little and the nurse noted that Ms. Glass had stopped crying and screaming. R. at 396. Dr. Christine Butts noted the main differential of gout, rheumatoid arthritis flare, and osteoarthritis. R. at 401. After a shift change several hours later, Dr. Julie Slick noted that Ms. Glass reported experiencing left foot pain initially that moved to the right foot. R. at 397. Although treated with colchicine and fentanyl, Ms. Glass was still experiencing severe pain. R. at 397. Dr. Slick noted left foot swelling and tenderness. R. at 397. An ongoing issue with poor blood pressure control was noted. R. at 401. Ms. Glass was also found to have very low potassium. R. at 397.

On August 24, 2015, Ms. Glass visited the UMC Clinic. R. at 434. Ms. Glass complained of continuing pain in her 1st right metatarsophalangeal ("MTP") joint and reported having pain in her left MTP joint also. R. at 435. She reported pain at a level of 10 out of 10. R. at 435. She reported having trouble walking because of the pain and that she could not wear shoes. R. at 435. Ms. Glass had started taking gabapentin about four months earlier and reported mild relief. R. at 435. Her blood pressure was 206/126 on arrival and 176/110 on recheck. R. at 438. Upon physical examination, her first MTP joint on the right was warm to the touch, and her left MTP joint was slightly warm. R. at 437. Both were painful to touch. Bilateral 1+ pedal edema was noted. R. at 417. Gait was antalgic due to foot pain. R. at 437. Ms. Glass was prescribed colchicine and allopurinol for gout. R. at 438. Noting the low potassium noted at her July 2015 emergency department visit, the UMC Clinic reported that Ms. Glass had not been taking replacement potassium as prescribed, and an oral replacement was re-prescribed. R. at 439. She was instructed to return to the Clinic in 1 week for blood pressure check and potassium. R. at 439.

Ms. Glass returned to the UMC Emergency Department on August 25, 2015, complaining of pain at a level of 10 out of 10 in her bilateral feet. R. at 412. Her record notes that she had visited the clinic the previous day to obtain a prescription for gout medication but was unable to get the medication filled because she could not afford it. R. at 412. Upon review of systems, Ms. Glass was positive for joint swelling and arthralgias in the left foot, but negative for back pain, gait problem, or neck pain. R. at 414. No headaches were reported. R. at 413. Upon physical examination, normal range of motion and no edema was noted. R. at 415. Right and left ankles exhibited swelling. R. at 415. An injection of toradol was administered. R .at 415. She was directed to a pharmacy that could provide her prescription cheaply. R. at 415.

Ms. Glass returned to the UMC Clinic on August 31, 2015. R. at 442. She reported pain in her bilateral feet had improved, but she was not able to obtain colchicine because the price of $185 was too expensive. R. at 443. She reported swelling had decreased and she was able to wear shoes. R. at 443. She denied other muscle pain, joint, pain, or weakness. R. at 444. No noticeable erythema was noted and joints were not painful to the touch. R. at 445. Ms. Glass was ambulating "much better" than the previous week and her gait was noted to be normal. R. at 445. The plan was changed to stop colchicine, but start allopurinol as soon as possible. R. at 446. An injection of Celestone was administered. R. at 447. Ms. Glass was also prescribed prednisone and a social worker was contacted to provide medication assistance. R. at 447.

Her blood pressure was 169/112 and 158/102. R. at 443. Ms. Glass had also been unable to take her omeprazole prescription due to cost resulting in heartburn symptoms. R. at 443. Ms. Glass reported she was unable to take her blood pressure medication due to cost. R. at 447. She was instructed to consult with the social worker for medication assistance on blood pressure medication also. R.at 447.

Ms. Glass consulted with licensed clinical social worker Jean Burke on September 3, 2015. R. at 451. They discussed assistance her medications. R. at 451. Paperwork was completed and the request was approved. R. at 451.

Ms. Glass returned to the UMC Clinic on November 2, 2015. R. at 452. She complained of sharp shooting pain from her feet up her legs. R. at 453. She had stopped taking gabapentin because of the cost and because it is "too many pills." R. at 453. It was noted that Ms. Glass "frequently requests Tramadol, and states if we do not provide pain medication, she will report to the ED for pain control." R. at 453. Upon physical examination of extremities, prior changes related to gout in bilateral first toes was not present, there was no erythema or swelling. R. at 454.

The assessment concluded as to her complaints of pain that "[b]ased on normal exam findings, and the clinical history, these complaints are likely neuropathic in nature." R .at 456. The following pain plan was developed: 300mg gabapentin in the evenings for one week, then morning and evening dosing for 1 week, and then titrate up to 3 times a day after; 50mg tramadol available for breakthrough pain. R. at 456. It was discussed that gabapentin was the appropriate medication for the pain she described and that tramadol would not be refilled. R. at 456. Her blood pressure was 142/88. She had been taking metoprolol, but had not been taking losartan and hydrazaline due to cost. R. at 457.

Ms. Glass consulted with social worker Burke on November 3, 2015, and on November 21, 2015, Burke noted that Ms. Glass had been approved for the Takeda Patient Assistance Program for assistance with Colcrys through December 31, 2016, and the first supply of medication was shipped to her home. R. at 460.

Ms. Glass visited the UMC Emergency Department on Canal Street on December 19, 2015. R.at 474. She was diagnosed with acute idiopathic gout of the right foot. R. at 474.  Ms. Glass returned to the emergency department on January 8, 2016. R. at 470. A foot x-ray was performed. R. at 473. She was diagnosed with right foot pain and tendonitis. R. at 471. Ms. Glass returned to the emergency department on February 16, 2016. R. at 468. She was diagnosed with acute idiopathic gout. R. at 468.

### Decision of the Administrative Law Judge

The ALJ found that Ms. Glass meets the insured status requirements of the Act through December 31, 2018.[1] R. at 19. The ALJ found that Ms. Glass had not engaged in substantial gainful activity since May 9, 2014. Id.  The ALJ found Ms. Glass has the following severe impairments:

---

[1] Ms. Glass argues that that her certified earnings record reflects her date last insured as December 31, 2019. The Commissioner does not address this argument. For purposes of this ruling, the date last insured is not relevant.

gouty arthritis and hypertension. Id.   The ALJ then found that Ms. Glass does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 20. The ALJ considered listing 1.02, which addresses major dysfunction of a joint and found that Ms. Glass did not meet the requisite conditions because she had not established that she is unable to ambulate effectively or that she is unable to perform fine and gross movements effectively. Id.   The ALJ also observed that there is not specific listing for hypertension, but note that in accordance with listing 4.00(H)(1), hypertension, because of its systemic nature, would be evaluated by reference to specific body systems affected under this listing and when assessing Ms. Glass's residual functional capacity. The ALJ found there was no evidence of a specific body system so affected as to meet a listing. Id.

The ALJ then found that Ms. Glass has the residual functional capacity to perform light work. Id.   The ALJ considered the hearing testimony of Ms. Glass where she said she could only walk one block, was unable to wear a shoe on her right foot, can only lift 5-10 pounds, drops items due to wrist weakness, and has headaches when her blood pressure rises. R. at 20-21. The ALJ considered Ms. Glass's testimony that she could take care of her personal hygiene, do laundry, and drive once or twice per month. Id.   The ALJ concluded that Ms. Glass's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but the ALJ found Ms. Glass's statements concerning intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical evidence. R. at 21. The ALJ considered the consultative examination of Dr. Hersh in November 2014, finding no abnormalities on physical examination, full range of motion in all joints, and a normal gait. Id.   The ALJ considered Ms. Glass's complaints of elbow pain at the emergency room on the amended disability onset date of

14

December 2, 2014. Id.  The ALJ noted that the x-ray showed only degenerative changes and a bone spur. Id.  The ALJ also noted that on December 23, 2014, Ms. Glass denied numbness or weakness when she was prescribed Flexeril for arthritis. Id.  The ALJ considered Ms. Glass's complaints of headaches in January 2014, but noted that she reported Aleve made them better. Id. The ALJ noted her complaints of right knee, neck and back pain and her elevated blood pressure. Id.  But the ALJ noted there were no deformities, swelling, warmth or erythema. R. at 21. In considering Ms. Glass's complaints of ankle pain and edema in the following month, the ALJ noted that Ms. Glass still had full range of motion in the ankle and was able to bear weight and ambulate. R. at 22. The ALJ considered Ms. Glass's June 2015 complaints of elbow pain, but noted that only mild tenderness was observed. Id.  The ALJ also considered her complaints of hip and joint pain at that time and noted that Ms. Glass reported walking alleviated the pain and that an x-ray of the right foot only revealed degenerative changes. Id.  The ALJ also considered records showing an x-ray showing soft tissue swelling and edema in July 2015, and ambulation with an antalgic gait the following month, but noted that Ms. Glass retained full range of motion. Id.  The ALJ noted that although her first MTP joint was warm to the touch, the following week swelling had reduced and the joint was no longer painful to the touch. Id.  The ALJ also considered a November 2015 medical record with an unremarkable physical exam, and emergency room records from early 2016 showing treatment for right foot pain. Id.

In assessing Ms. Glass's residual functional capacity, the ALJ observed that Ms. Glass had described daily activities that were not limited to the extent one would expect given the complaints of disabling symptoms. Id.  The ALJ also determined that Ms. Glass had not received the type of medical treatment one would expect from a totally disabled person. Id.  The ALJ found Ms. Glass's treatment was essentially routine and conservative in nature. Id.  The ALJ noted the absence of

any referral to a specialist of physical therapist. Id.  The ALJ also observed that the medication prescribed does not indicate the presence of impairments more limiting than those found in the ALJ's decision. Id.  The ALJ also noted the absence of any opinions from treating or examining physicians indicating Ms. Glass is disabled. Id.  The ALJ concluded that Ms. Glass's "treatment for arthritis and uncontrolled blood pressure warrants a limitation of light work since she denies unsteadiness or dizziness, and she is able to ambulate normally unassisted." R. at 23.

The ALJ then found that Ms. Glass is capable of performing past relevant work as a medical clerk/medical records clerk because the work does not require performance of work-related activities precluded by her residual functional capacity. Id.  The ALJ then found that Ms. Glass has not been under a disability from May 9, 2014, through the date of his decision on April 20, 2016. R. at 23.

## Statement of Issues on Appeal

Issue No. 1.    Whether the ALJ erred by failing to follow the guidelines of SSR 16-3P and 20 C.F.R. 404.1529(c)(4) and 416.929(c)(4) in his evaluation of Ms. Glass's statements regarding the intensity, persistence, and limiting effects of her symptoms.

Issue No. 2.    Whether the ALJ erred by failing to identify any limitations related to hypertension which he finds is a "severe" medically documented impairment.

## Analysis

### I.  Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames

v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.     Entitlement to Benefits under the Act.

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

(1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe

17

impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.  An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

## I.     **Plaintiff's Appeal**.

*Issue No. 1.     Whether the ALJ erred by failing to follow the guidelines of SSR 16-3P and 20 C.F.R.  404.1529(c)(3) and 416.929(c)(3) in his evaluation of Ms. Glass's statements regarding the intensity, persistence, and limiting effects of her symptoms.*

Ms. Glass points to Social Security Ruling 16-3P, which requires adjudicators to examine the entire case record in assessing the intensity, persistence, and limiting effects of an individual's symptoms.  Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P (S.S.A. Oct. 25, 2017). The following factors should be considered:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

Id.  In considering inconsistencies in an individual's statements, SSR 16-3P instructs that "inconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time." Id.  With regard to course of treatment, SSR 16-3P explains that "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." Id.

Ms. Glass seems to argue that the ALJ's finding that her daily activities are not as limiting as expected is inconsistent with her testimony at the hearing and her Function Report which indicate she has limitations with walking, standing, lifting, and performing household chores. But as the Commissioner correctly points out, it is the ALJ's role to resolve any conflicts between claimant's subjective statements during the administrative hearing and her earlier reports. Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999) (quoting Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990)) ("Conflicts in the evidence are for the [Commissioner] and not the courts to resolve.").The Commissioner also cites to Owens v. Heckler, where the court of appeals found that the ALJ's finding that the claimant could perform light work was consistent with claimant's testimony that he could stand 15-20 minutes at a time, sit for one hour, walk about one mile, drive short distances, and perform daily activities like attending church, doing light yard work, going to the grocery store, and caring for his personal needs. 770 F.2d 1276, 1282 (5th Cir. 1985). With the exception of walking, the reported abilities of Ms. Glass here are similar. Moreover, as the Commissioner notes, the ALJ considered other factors besides Ms. Glass's daily activities. The ALJ's consideration of Ms. Glass's daily activities does not result in a finding of error here.

Ms. Glass argues that in considering the conservative treatment she experienced, the ALJ should have considered that Ms. Glass reported she had difficulty affording treatment. The Commissioner argues that inability to afford treatment must be corroborated. Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990). In Villa, the claimant also argued that the ALJ should not have considered his failure to take medication for pain or to follow a prescribed course of treatment as a basis for discounting his complaints because both were prompted by his indigence. Id. The court of appeals rejected this argument and the cases holding that a person unable to afford treatment that would remedy their condition considered disabled, noting that there was "no record evidence, besides [the claimant's] testimony, that he would be disabled with or without regular medical treatment." Id. Here, the Court notes, there is some record evidence indicating that Ms. Glass had difficulty affording treatment. She consulted with a social worker at least twice for purposes of obtaining assistance in affording medication. The record indicates she was approved for assistance. But this does not affect the ALJ's conclusion that Ms. Glass's treatment was conservative. In making this finding, the ALJ observed that Ms. Glass had not been referred to a specialist or for physical therapy. There is no indication that Ms. Glass's inability to afford treatment played any role in that. The ALJ also observed that the type of medication prescribed did not suggest the presence of impairments that are more limiting than found by the ALJ. This observation is not rendered false by the fact Ms. Glass received assistance to obtain some of the prescribed medications. There is no error in the ALJ's failure to consider Ms. Glass's alleged inability to afford treatment.

Ms. Glass also argues that the evidence as a whole contradicts the ALJ's finding that the medical records indicate that she failed to mention the adverse symptoms and limitations. Ms. Glass points to her testimony that she suffers chronic pain in her ankles and legs and that standing

and walking are painful and cause her feet to swell. Ms. Glass also notes that in her Function Report she stated she was unable to walk more than one block. Ms. Glass points to the disability interviewer that observed she had trouble standing up on October 2014. Ms. Glass insists these statements and observations are consistent with the pain and limitations Ms. Glass reports throughout the medical record. Ms. Glass notes that light work requires a person to be able to walk and stand for a total of six hours in an eight hour work day. Ms. Glass argues that the objective and clinical evidence documenting pain, swelling, and deformities in Ms. Glass's feet and legs is inconsistent with a residual functional capacity for light work.

But as the Commissioner points out, the ALJ correctly observed that there was no opinion evidence from any physician limiting Ms. Glass to anything more restrictive than the full range of light work. Ms. Glass had edema in February 2015, July 2015, and August 2015, and she experienced joint swelling in the feet and ankles in July and August 2015. But in February 2015 she nonetheless had normal range of motion and no tenderness. And in July 2015 she had no gait problems. Although her gait was antalgic due to foot pain on August 24, 2015, by the next day and again the following week, her gait was normal. No edema or swelling in the lower extremities was reported or found in August 2014, October 2014, November 2014, December 2014, January 2015, March 2015, April 2015, June 2015, late August 2015, and November 2015. Her gait was normal in July 2014, October 2014, November 2014, December 2014, March 2015, and June 2015. Although Ms. Glass did complain of joint pain (sometimes in her hips, sometimes in her feet/ankles, sometimes in her neck, sometimes in her hand, and sometimes in her elbow), at other times she did not report pain in those very same areas. At one time when she complained of hip pain, she also reported the pain improved with ambulation.

21

Ms. Glass argues that the ALJ failed to consider all the evidence as required. As the Commissioner points out, the ALJ considered Ms. Glass's daily activities, her routine, her conservative treatment, her failure to mention adverse symptoms and limitations to treating or examining physicians, and the absence of any opinions indicating further limitations than those found by the ALJ. Although Ms. Glass challenges how the ALJ weighed the evidence and the ALJ's ultimate conclusions, Ms. Glass does not point to any evidence that the ALJ failed to consider. Without that, the Court cannot find the ALJ failed to consider evidence or that such failure resulted in prejudice.

Ms. Glass argues that the ALJ did not identify objective evidence or articulate reasons to support his findings that Ms. Glass's statements are not consistent with the medical evidence. But this argument does not support a finding of error. As the Commissioner points out, "[t]he ALJ is *not* required to mechanically follow every guiding regulatory factor in articulating reasons for denying claims or weighing credibility." Giles v. Astrue, 433 F. App'x 241, 249 n. 30 (5th Cir. 2011) (quoting Clary v. Barnhart, 214 F. App'x 479, 482 (5th Cir. 2007) (emphasis in original). In Giles, the Fifth circuited noted that "[t]he Social Security Ruling on credibility determinations denotes the 'kinds of evidence,' including the above factors, that must be considered, but there is no instruction that every factor must be discussed in detail in the determination." Id. at 249. The referenced Social Security Ruling was 96-7p, which was superseded by SSR 16-3p, cited by the claimant here. Similarly, SSR 16-3p does not explicitly require that every factor must be dismissed in detail in the determination. Moreover, the ALJ discussed the relevant credibility factors and explained the reasons for his determination that the record does not support Ms. Glass's claims.

The Court finds no error in the ALJ's evaluation of Ms. Glass's statements regarding the intensity, persistence, and limiting effects of her symptoms. The ALJ reasonably complied with

the guidelines of SSR 16-3P by considering all of the evidence, including the listed factors. The ALJ's finding that Ms. Glass has a residual functional capacity to perform light work is supported by substantial evidence.

*Issue No. 2.    Whether the ALJ erred by failing to identify any limitations related to hypertension which he finds is a "severe" medically documented impairment.*

Ms. Glass argues that the ALJ failed to impose any limitations related to hypertension, even though the ALJ found her hypertension to be severe. Although the record does reflect that Ms. Glass's blood pressure was frequently elevated, contrary to Ms. Glass's claims, it does not show a history of resulting symptoms. Ms. Glass testified that she experienced headaches twice a week when her blood pressure was high. But the medical evidence in the record shows a complaint of headaches only on January 14, 2015, April 22, 2015, and July 21, 2015. The only treatment related to headaches appears to be an instruction to continue Tylenol and NSAIDs on April 22, 2015. As the ALJ noted in assessing Ms. Glass's residual functional capacity, there is no indication of unsteadiness or dizziness. Besides the few complaints of headaches, Ms. Glass fails to point to any medical records indicating any hypertension related limitations that should have been incorporated into Ms. Glass's residual functional capacity.

Moreover, the ALJ recognized Ms. Glass's severe hypertension when he found that she should be restricted to light work. And as the Commissioner points out, Ms. Glass performed work as a bus driver, care giver, medical clerk, and medical records clerk while suffering from hypertension. See Vaughan v. Shalala, 58 F.3d 129, 131 (5th Cir. 1995) (considering that the claimant "was able to, and did, work for several years while suffering from ailments she now asserts are disabling" in affirming the ALJ's finding that the claimant could perform a wide range of sedentary work).

Ms. Glass points to Dr. Hersh's recommendation that she avoid strenuous activity until her blood pressure is controlled. But Ms. Glass presents no basis for finding that light work amounts to strenuous activity.

The Court finds no error in the ALJ's failure to include additional limitations related to hypertension in assessing Ms. Glass's residual functional capacity.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 14) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 15) be GRANTED.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 27th day of June, 2018.


Janis van Meerveld
United States Magistrate Judge